

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00073-CV

IN THE INTEREST OF K.S., C.S.,
AND C.S, THE CHILDREN

----------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 2013-40079-362

----------

## MEMORANDUM OPINION[1]

----------

Appellant S.S. (Mother) appeals the trial court's order terminating her parental rights to her three children:  K.S. (Katherine), C.S. (Claire), and C.S.

----

[1]*See* Tex. R. App. P. 47.4.

(Colin).[2]   In three issues, Mother complains that the evidence is legally and factually insufficient to support the jury's statutory-endangerment and best-interest findings.[3]   Mother argues in her fourth issue that the trial court abused its discretion by allowing her attorney to withdraw from the case less than a month before trial.  We affirm.

## I.
## Background

Mother was thirty years old at the time of the final jury trial on the Department's petition seeking termination of her parental rights.   She moved from Indiana to Texas to live with her aunt, D.H. (Aunt Daphne), and uncle, C.H. (Uncle Carl), when she was eighteen years old.[4]   Mother met C.A.S. (Father) in 2006.   When Mother discovered she was pregnant with Katherine three months

---

[2]Except for employees of the Department of Family and Protective Services (the Department) and Mother's attorneys, we use aliases to protect the identities of the individuals involved in this case.  *See* Tex. R. App. P. 9.8(b)(2).

[3]The trial court also terminated Father's parental rights.  Prior to the start of the trial, Father relinquished his parental rights to the children.  The trial court found by clear and convincing evidence that Father had executed an unrevoked or irrevocable affidavit of relinquishment of parental rights to the children as provided by family code section 161.103(e) and that termination of Father's parental rights to the children is in the children's best interest.  *See* Tex. Fam. Code Ann. § 161.103(e) (West 2014). Father is not a party to this appeal.

[4]Mother moved to Texas to escape her family.  Mother's father sexually abused her from at least the age of three through her teenage years.  Mother eventually reported her father to the authorities, and her father was incarcerated. Mother's parents divorced, and Mother's mother blamed her for destroying their family.   Other than Aunt Daphne and Uncle Carl, Mother has virtually no relationship with her family.

2

later, Mother and Father got married.[5]  Katherine was born in January 2007 with significant health issues, including Caudal Regression Syndrome, which impaired Katherine's use of her lower extremities and confined her to a wheelchair.[6] Mother gave birth to Claire in March 2008.  After Claire's birth, Mother suffered from severe postpartum depression and suicidal and homicidal ideations and was hospitalized several times over the course of eight months.  Colin was born in July 2010.

Up until about a year after Colin was born, Father supported the family financially.[7]  According to Mother, around this time, Father began using drugs and having anger-management issues.  On at least one occasion, he was physically violent.  In May 2011, Father told Mother he had a job offer in Ohio, and the family moved there.  Mother testified that upon arrival in Ohio, she discovered that Father lied about having a job there.  Father then told Mother that he had a job with Microsoft in North Dakota, but after the family moved to North Dakota, Father told Mother that the job "wasn't happening."  When Father failed to obtain employment in North Dakota, Mother got a job and left the children at

---

[5]Unbeknownst to Mother, Father was already married, but he obtained a divorce from his first wife two years after Mother and Father were married.

[6]Katherine will be physically disabled for her entire life.

[7]Mother stayed home and cared for the children.

3

home with Father.[8] Mother stopped working when Father attempted suicide. Overwhelmed with the situation, Mother contacted Aunt Daphne, and Aunt Daphne offered to let the family live with her and Uncle Carl in Texas.

The family moved back to Texas in December 2011, and they began living with Aunt Daphne and Uncle Carl. In February 2012, Mother was hospitalized for two weeks with suicidal ideations and was prescribed medication.

In May 2012, at Father's insistence, the family moved into a Staybridge Suites extended-stay hotel in Plano, Texas. Around this time, Mother discovered Father was using K2, a type of synthetic marijuana. Father was not working or trying to get a job, and Father's father was paying the family's bills.[9] Around this time, Father began throwing things at Mother and choking her until she was unconscious.

In November 2012, the family moved to a Budget Suites extended-stay hotel in Lewisville, Texas. Mother testified that after moving to the Budget Suites, Father's abuse increased, and he began hitting her.

In early November 2012, Father began using methamphetamine. Mother testified that there was a methamphetamine lab in the Budget Suites and that

---

[8]During this time, the family was living in an extended-stay hotel. Mother testified that Father's father was paying for the hotel. Father's father testified that Mother and Father were using his credit cards without his permission to pay for the hotel.

[9]Father's father testified that Mother and Father were also not authorized to use his credit cards to pay for their stay at the Staybridge Suites.

Father bought methamphetamine from a dealer who lived upstairs. Father brought methamphetamine back to the family's suite on Thanksgiving Day and convinced Mother to try it. Mother continued to use methamphetamine and also tried K2. Mother claims she started using methamphetamine because she was overwhelmed by her circumstances. Around this time, Father's abuse of Mother became much more frequent.

On January 22, 2013, Officer Carla Michel and Sergeant Gordon Blair with the Lewisville Police Department responded to a call from Mother complaining that Father was threatening to kill himself and the children, had barricaded himself in a room in the family's suite, and was trying to light a bed on fire. Officer Michel testified that when she arrived on the scene, Father was in the parking lot with two police officers who had Father in handcuffs.[10] Mother and the children were in the suite, and Mother seemed almost catatonic. Mother reported to Officer Michel that Father had physically assaulted her the evening before, held a curling iron to her leg, and pushed her head into a wall, but Officer Michel was unable to determine if Mother suffered any physical injuries.[11]

---

[10]Father was arrested and incarcerated for several days.

[11]Photographs of Mother taken at the scene do not reveal any physical injuries. At trial, Mother explained that when Father assaulted her, she only hit her head and any bruises or bumps were hidden by her hair. She further explained that she did not have a burn mark on her leg because she was wearing pants at the time of the assault.

Mother also told Officer Michel that Father was upset because he thought Mother was hiding methamphetamine from him. Mother told Sergeant Blair that she and Father were using drugs. Officer Michel testified that in one of the bedrooms accessible by the children, she discovered a marijuana grinder and marijuana residue within the children's reach.

Both Sergeant Blair and Officer Michel testified that the suite and the children were extremely dirty. Sergeant Blair did not feel that he could leave the children with Mother because he did not believe that she could take care of them: she was unresponsive, lethargic, stumbling, and slurring her speech. Officer Michel also believed that the children would be in danger if left in Mother's care, so she called the Department.

Natalie Taylor, an investigator with the Department, responded to the call. Taylor testified that when she arrived, she observed that the children were very dirty. Mother initially refused to talk to Taylor, but she eventually told Taylor that she could not care for the children or keep them safe. Mother informed Taylor that since Thanksgiving, she and Father had been using marijuana and methamphetamine multiple times a day in their suite with the children present.[12] But Mother also claimed that she last used drugs three days prior to January 22.

Mother reported to Taylor that the evening before, Father flew into a rage trying to find the methamphetamine he thought Mother had hidden. Consistent

---

[12]At trial, Mother denied that she used drugs in front of the children.

with her call to the police, Mother also told Taylor that Father said he would kill himself and the children and that Father tried to burn the bed.[13] Taylor observed a grapefruit-sized burn mark on one of the beds. The children told Taylor that Mother and Father had been yelling at each other, that Father stated that he wanted to kill them, and that Father tried to burn the hotel down.

Based on her observations, it was Taylor's opinion that Mother was physically and mentally unable to care for the children. Mother was suffering from drug withdrawal, was irritable and lethargic, and seemed unwilling to care for the children.[14] Mother also told Taylor that she should take the children because Mother could no longer keep them safe.

Taylor testified that based upon her observations, she recommended that the children be removed. Mother requested that the children be placed with Aunt Daphne, and after performing background checks, the Department placed the children with Aunt Daphne and Uncle Carl. The children were excited to leave the hotel and were not upset to leave Mother. Mother did not hug the children or

---

[13]Mother gave a more detailed account of the incident at trial. Mother testified that Father hit Mother, causing Mother to strike her head on the bathroom tile and lose consciousness. When Mother refused to tell Father where she hid the methamphetamine, he threatened to light Claire on fire with a lighter. Then, Father threatened to burn Claire with a curling iron. When Mother threw herself on top of Claire to protect her, Father burned Mother with the curling iron.

[14]Mother told Taylor that she stopped caring about the children in June 2012. At trial, Mother testified that she was "okay" and had not "given up" in the summer of 2012 and that she started to feel overwhelmed by her circumstances and depressed after the family moved to the Budget Suites.

7

display any signs of affection towards them when they left the hotel with Taylor. The children were also very excited to leave with Aunt Daphne when she arrived at Taylor's office to pick them up.

Mother returned to the hotel. The next day, Aunt Daphne found Mother in a diabetic coma.[15] Mother was admitted to the hospital and kept in a medically-induced coma and on a ventilator for four days. When she woke up, Aunt Daphne took Mother to a mental hospital where Mother remained for three or four days.

Because of Mother's health condition, Father's incarceration, the parents' drug use, the domestic violence occurring in the home, and the parents' unwillingness to participate in a previous case involving the Department,[16] the Department filed a petition requesting that the Department be appointed temporary managing conservator of the children. The Department also had the children drug tested because they had been exposed to drugs. Colin's hair follicle test came back positive for methamphetamine.[17] As a result, Mother and

---

[15]Mother has type I diabetes and has been insulin dependent since age five. Mother also suffers from celiac disease and neurocardiogenic syncope.

[16]In 2008, the Department received a report of neglectful supervision and physical abuse of Katherine and Claire by Mother and Father during the time Mother was suffering from postpartum depression and suicidal and homicidal ideations. The Department nonsuited the case without removing the children.

[17]Mother testified that she caught Colin playing with Father's methamphetamine supply in the parents' bedroom. Mother did not think Colin ingested any of the drug. Mother did not call 911 because "[calling 911 is] not

8

Father were each charged with child endangerment and were arrested on February 24, 2013.

At a hearing on February 28, 2013, the Department was appointed temporary managing conservator of the children. Mother's service plan required her to, among other things, provide child support and medical support, attend weekly visitation sessions with the children, attend weekly counseling sessions, attend and successfully complete parenting and healthy relationship classes, attend at least five Alcoholics Anonymous (AA) or Narcotics Anonymous meetings per week, and establish and maintain stable housing and suitable employment. Mother testified that it was difficult to work on the service plan while she was incarcerated,[18] but she attended AA and healthy relationship classes while she was in jail. Shortly after Mother was released from jail on a personal recognizance bond on June 6, 2013, Mother began working on her service plan by attending counseling sessions.

Father was released from jail in mid-July 2013. Mother and Father each pled guilty to child endangerment and were placed on community supervision.[19] Mother continued to work on completing her service plan and completed several

something you think about, when you are messed up, that's not where your brain goes, so I'm not sure where I would be thinking that, at that time."

[18]Two of the Department's witnesses admitted that it was difficult to work services while incarcerated.

[19]Father violated the terms of his community supervision, and as a result, was incarcerated in the Denton County Jail at the time of trial.

aspects of the plan, including regularly attending AA meetings. However, she admitted at trial that she had failed to pay any child support or medical support for the children, failed to obtain employment, and failed to secure safe and stable housing.

Alicia Fitzpatrick, the Department conservatorship worker assigned to the case, testified that she believed the children were physically and emotionally endangered by Mother and Father. The children told Fitzpatrick that they had witnessed family violence in the home. The children began counseling on March 1, 2013, and it was the Department's position that the children should receive ongoing counseling because of the trauma they suffered.

Fitzpatrick visited Mother several times while Mother was incarcerated. Mother admitted to having trouble bonding with two of the children and asked Fitzpatrick if there was therapy available to teach her to love those children. Mother also further elaborated on Father's abuse of Claire. Father not only threatened to burn Claire with a lighter and a curling iron, but he also caught Claire's hair on fire with the lighter. Mother told Fitzpatrick that she was undecided about maintaining her relationship with Father because she did not believe in divorce. Mother talked about setting rules for Father and conditioning their relationship on Father's following those rules, but Fitzpatrick was concerned that Mother would consider maintaining a relationship with Father.

Even though Fitzpatrick offered to help Mother escape from Father on multiple occasions, Mother failed to make a firm effort to separate from Father.

10

After the children's removal, Mother and Father stayed together when they were not both incarcerated. Mother was sixteen weeks pregnant with Father's child at the time of trial. And at the end of December 2013 and at the beginning of January 2014, Mother called and visited Father in jail. Mother's continuing relationship with Father was a huge concern for the Department because the Department was concerned about her ability to protect the children.

Fitzpatrick admitted that Mother worked services but stated that Mother failed to complete them at a level that demonstrated that she had materially changed her life. Specifically, Mother failed to obtain and maintain employment or a place to live and failed to pay child support or medical support. Fitzpatrick testified that the Department believed that termination of Mother's parental rights was in the children's best interest and that the Department's plan was for the children to be adopted by Aunt Daphne and Uncle Carl.

Aunt Daphne and Uncle Carl have cared for the children since their removal in January 2013. At the time of trial, Aunt Daphne was fifty-four years old, and Uncle Carl was fifty-two. They have been married for thirty years, are in good health, and are steadily employed.[20]

Aunt Daphne and Uncle Carl intended to adopt the children if Mother's rights were terminated. At the time of trial, Aunt Daphne and Uncle Carl were in the process of completing the licensing procedure to adopt the children. Aunt

---

[20]If something happens to Aunt Daphne and Uncle Carl, they have made arrangements for Mother's brother and his wife to care for the children.

11

Daphne testified that she thinks it is important that the children go to a family member who loves them and cares about their well-being. She and Uncle Carl want the children to grow up with as many advantages as possible and have a good, full life.

Aunt Daphne testified that the children were adapting well. Katherine was in first grade, Claire was in kindergarten, and Colin was attending daycare in preparation for pre-kindergarten. Katherine was enrolled in kindergarten at the time of removal, but she had not been attending school because Mother and Father lacked transportation. While living with Aunt Daphne and Uncle Carl, Katherine rode the school bus to school. Aunt Daphne and Uncle Carl were attending to Katherine's medical needs at the Texas Scottish Rite Hospital for Children and were working with her to improve her mobility.

Aunt Daphne did not believe that Mother was able to care for the children because she did not have a place to live and was not prepared to meet the needs of three children. Aunt Daphne testified that Mother loves the children, but she does not believe that Mother can provide the children with everything they need to keep them safe and happy. Aunt Daphne believed that termination of Mother's parental rights was in the children's best interest. Aunt Daphne also believed that Mother should be able to visit the children but only if Aunt Daphne had the power to dictate Mother's access and visitation.

After a five-day trial, the jury found by clear and convincing evidence that (1) Mother knowingly placed or knowingly allowed the children to remain in

conditions or surroundings which endangered the children's physical or emotional well-being; (2) Mother engaged in conduct, or knowingly placed the children with persons who engaged in conduct, which endangered the children's physical or emotional well-being; and (3) termination of the parent-child relationship between Mother and the children was in the children's best interest. The trial court entered judgment on the jury's verdict, and terminated Mother's parental rights.

## II.
## Withdrawal of Mother's Counsel

In her fourth issue, Mother contends the trial court abused its discretion by allowing her attorney to withdraw as counsel twenty-eight days before trial.

## A. Applicable Law

We review the granting of a motion to withdraw as counsel for an abuse of discretion. *Sims v. Fitzpatrick*, 288 S.W.3d 93, 100 (Tex. App.—Houston [1st Dist.] 2009, no pet.). A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). A trial court abuses its discretion when it grants a motion to withdraw that does not comply with the mandatory requirements of rule of civil procedure 10. *Sims*, 288 S.W.3d at 100; *see* Tex. R. Civ. P. 10. "However, 'such error may be harmless if the court allows the party time to secure new counsel and time for the new counsel to

13

investigate the case and prepare for trial.'" *Gillie v. Boulas*, 65 S.W.3d 219, 221 (Tex. App.—Dallas 2001, pet denied) (quoting *Walton v. Canon, Short & Gaston*, 23 S.W.3d 143, 149 (Tex. App.—El Paso 2000, no pet.)).

## B. Analysis

Mother does not argue that the motion to withdraw does not comply with the mandatory requirements of rule 10. *See* Tex. R. Civ. P. 10. Even if the motion did not satisfy rule 10, Mother cannot show she was harmed by the trial court granting the motion to withdraw.

The trial in this case began on February 3, 2014. On December 19, 2013, Bonny Haynes, Mother's court-appointed attorney, filed a motion to withdraw as Mother's counsel, stating that "[g]ood cause exists for withdrawal of Bonny Haynes as counsel, in that [Mother] does not wish for Bonny Haynes to represent her at this time and desires to have another attorney appointed to represent her at this time." At the January 6, 2014 hearing on the motion, Mother confirmed on the record that she no longer wanted Haynes to represent her and stated that she had consulted with another attorney, Stephen Wohr, to represent her. Mother further stated that Wohr agreed to represent her if Haynes withdrew and the court appointed Wohr as Mother's attorney. Mother also said she informed Wohr that the trial was set in approximately one month, but she did not know if he was prepared to try her case. After contacting Wohr off the record during the hearing, the trial court appointed Wohr to represent Mother. At several times during the hearing, the trial court stated that it would not grant a continuance of

14

the February 3 trial setting and wrote "No Continuances!" at the bottom of the written order appointing Wohr.

Mother argues that it is unacceptable that it took two weeks for the trial court to conduct a hearing on the motion to withdraw and that "[i]t is inconceivable that any lawyer would be able to adequately prepare for a termination jury trial in 28 days, much less a case that had over 2,000 pages of documents entered as exhibits." Mother also points out that the Department filed a notice of jury demand in the period between the filing of her motion to withdraw and the hearing on the motion. However, Mother does not make any showing that she did not have adequate time to secure new counsel and for the new counsel to investigate the case and prepare for trial. *See Sims*, 288 S.W.3d at 100. Both Mother and Wohr knew the case was set for jury trial on February 3. Even after the trial court's statements at the January 6 hearing that it would not continue the February 3 trial setting, Mother still insisted that Haynes withdraw and that Wohr be appointed as her counsel. The trial court contacted Wohr before appointing him as Mother's counsel at the conclusion of the January 6 hearing. And even though Wohr stated during the hearing on Mother's motion in limine that he had only been "on the case for three weeks," he never complained that his short tenure as Mother's counsel prevented him from adequately representing Mother nor did he file a motion for continuance. Moreover, we have reviewed the entire record of the trial and conclude that Wohr's representation of Mother at trial does not indicate that he did not have adequate time to investigate

15

the case or to prepare for trial. Accordingly, we conclude that the trial court did not abuse its discretion by granting the motion to withdraw. *See id.*

### III.
### Termination of Mother's Parental Rights

**A. Standards of Review**

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West 2014), § 161.206(a) (West 2014); *E.N.C.,* 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.,* 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.,* 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S.

16

at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is

17

contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D) and (E) of section 161.001(1) and that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

18

**B. Endangerment**

Mother argues in her first and second issues that that evidence is legally and factually insufficient to support the jury's subsection (D) and (E) endangerment findings. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

### 1. Applicable Law

The jury determined that Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being and engaged in conduct, or knowingly placed the children with persons who engaged in conduct, which endangered their physical or emotional well-being. *See id.* Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review. *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.); *In re J.T.G.*, 121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.).

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. Under subsection (D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the

19

physical or emotional well-being of a child. *See id.* at 776–77; *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

20

## 2. Analysis

At trial, Mother acknowledged that she engaged in conduct that endangered the physical and emotional well-being of the children and that she knowingly placed or knowingly allowed the children to remain in surroundings that endangered their physical and emotional well-being. Nevertheless, she contends the evidence is legally and factually insufficient to support the jury's subsection (D) finding, pointing out that she recognized that the children were in an unsafe environment and that she sought help by calling the Lewisville Police Department. Concerning the jury's subsection (E) finding, Mother argues that she did not continue a conscious course of conduct that endangered her children.

Colin tested positive for methamphetamine, resulting in Mother and Father's being charged with and pleading guilty to child endangerment. Further, for at least two months, Mother allowed the children to remain in conditions that endangered their physical and emotional well-being and engaged in conduct that endangered their physical and emotional well-being. When Mother finally called the police on January 22, 2013, Mother and Father had been using methamphetamine and marijuana several times a day since Thanksgiving 2012. At trial, Mother denied that she used drugs in front of the children, but the jury could have reasonably chosen to disbelieve this in light of her endangerment conviction and her statement to Taylor that she and Father had been using drugs in their suite with the children present.

21

The jury also heard evidence of Father's continued physical abuse of Mother in the home. Mother testified that this abuse began in the summer of 2012 and escalated over time, and eventually, Father harmed Claire. Fitzpatrick testified that the children told her they had witnessed family violence in the home. Fitzpatrick stated that she was concerned about Mother continuing her relationship with Father and her ability to protect the children from him.

Applying the applicable standards of review, we conclude that the evidence was legally and factually sufficient to support the jury's findings that Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being and that she engaged in conduct, or knowingly placed the children with persons who engaged in conduct, which endangered the children's physical or emotional well-being. *See, e.g.*, *In re K.W.*, No. 02-09-00041-CV, 2010 WL 144394, at *7–8 (Tex. App.—Fort Worth Jan. 14, 2010, no pet.) (mem. op.) (holding that mother's drug use supported endangerment finding under subsections (D) and (E)); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)."); *J.T.G.*, 121 S.W.3d at 125 (noting that parental drug use and domestic violence supported endangerment findings under subsections (D) and (E)). Accordingly, we overrule Mother's first and second issues.

22

## C. Best Interest

Mother argues in her third issue that the evidence is legally and factually insufficient to support the jury's finding that termination of her parental rights is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2) (requiring clear and convincing evidence "that termination is in the best interest of the child").

### 1. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *C.H.*, 89 S.W.3d at 28; *see E.C.R.*, 402 S.W.3d at 249. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

    (A)    the desires of the child;

    (B)    the emotional and physical needs of the child now and in the future;

    (C)    the emotional and physical danger to the child now and in the future;

    (D)    the parental abilities of the individuals seeking custody;

23

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## 2. Analysis

Mother argues the evidence is legally and factually insufficient to support the jury's best-interest finding because there was no evidence of Claire's and Colin's desires. Mother asserts that she never harmed the children and argues that there was no evidence that allowing Mother access to the children will impair

24

their physical and emotional needs or well-being or that the existing relationship between Mother and the children was improper.

Even though there was no evidence concerning Claire's and Colin's desires, Mother testified that Katherine wanted to live with her. Taylor, Fitzpatrick, and the Court Appointed Special Advocate (CASA) assigned to the case testified that Mother's interaction with the children during supervised visitation sessions was appropriate. Mother also completed most of the requirements set forth in the service plan. As of the time of trial, Mother reported being sober since January 2013, and she was faithfully attending AA classes multiple times a week. Even with this evidence, however, the *Holley* factors weigh in favor of termination.

Fitzpatrick, Aunt Daphne, and the CASA testified that it was in the children's best interest for Mother's rights to be terminated and for Aunt Daphne and Uncle Carl to adopt the children. Without repeating the evidence discussed above, the children were exposed to Mother's and Father's drug use and to domestic violence. It was unclear from Mother's testimony whether she intended to separate from Father. Mother also failed to present specific evidence indicating how she planned to provide for her children in the future, one of whom has special needs. Mother testified that she planned to leave the children with Aunt Daphne and Uncle Carl until she was able to obtain employment and housing. "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.R.W.*, No. 14-12-00850-CV,

2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.). Since the children's removal, Mother has not had stable housing. When she was not incarcerated, she lived in shelters, with friends, or with Father when he was not incarcerated. At the time of trial, Mother was living rent-free with R.H. (Robert), a friend she met in AA. There was no evidence indicating whether Robert would allow the children to live with Mother at his home, but Robert testified that Mother knew she was not going to live in his house with her new baby.

Mother also did not have a job at the time of trial. She was earning money cleaning houses and buying and selling the contents of storage units with Robert. In the month proceeding trial, Mother earned approximately $260 cleaning houses, which she used to pay for her cell phone and to buy food and insulin. Mother claimed that she had been looking for a job every day since June 2013 without success and that her job search had been difficult because she lacked transportation and because of her child-endangerment conviction.

In contrast to Mother's history with the children, the evidence reflects that since their removal, the children have been doing well in Aunt Daphne and Uncle Carl's home. The Department's plan for the children was adoption by Aunt Daphne and Uncle Carl, who were currently working to become licensed to adopt the children. The record reflects that Aunt Daphne and Uncle Carl were able to meet the children's emotional and physical needs and would provide stability and permanence for the children. They would also ensure that Katherine received

26

proper medical care. Fitzpatrick testified that adoption was in the children's best interest because they were young and needed permanency and stability.

Applying the applicable standard of review and weighing the evidence as it relates to the *Holley* factors, we conclude that the evidence is legally and factually sufficient to support the jury's finding that termination of Mother's parental rights was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best interest factors weighed in favor of termination); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (noting that "[s]tability and permanence are paramount in the upbringing of a child" and affirming a finding that termination was in a child's best interest when the child showed improvement in foster care); *In re M.R.*, 243 S.W.3d 807, 820–21 (Tex. App.—Fort Worth 2007, no pet.) (holding evidence factually sufficient to support best-interest finding because parents exposed children to domestic violence and drug abuse, mother had failed to obtain housing and employment, and children flourished in foster care). Accordingly, we overrule Mother's third issue.

27

## IV.
## Conclusion

Having overruled all four of Mother's issues, we affirm the trial court's order terminating Mother's parental rights to Katherine, Claire, and Colin.


/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL:  GARDNER, WALKER, and MCCOY, JJ.

DELIVERED:  August 7, 2014

28